# Richmond

HAROLD HARPER v. COMMONWEALTH OF VIRGINIA.

January 17, 1955.

Record No. 4327.

Present, Hudgins, C.J., and Eggleston, Spratley, Buchanan, Miller
and Smith, JJ.

The opinion states the case.

*Hill, Martin & Robinson,* for the plaintiff in error.

*J. Lindsay Almond, Jr., Attorney General* and *C. F. Hicks, Assistant Attorney General,* for the Commonwealth.

HUDGINS, C. J., delivered the opinion of the court.

Harold Harper, the accused, was indicted under the maiming act, Code section 18-70, tried, found guilty of committing assault and battery upon Frank E. Webb, and sentenced to confinement in jail for twelve months.

His first contention is that the evidence for the Commonwealth was insufficient to sustain the verdict; hence, he says the court committed reversible error in overruling his motion to set it aside. There is a sharp conflict in the testimony on vital issues. That for the Commonwealth is substantially as follows:

On July 4, 1953, the accused and his wife went in an automobile to the back of Charles Spencer's store at Buckingham Court House for the purpose of buying ice. Richard Throckmorton, an employee of Charles Spencer, was in charge of selling and delivering ice from the rear of a truck which protruded from the entrance to a shed into a vacant space where customers would drive their motor vehicles down to the shed and park close to the rear end of the truck. Several minutes before the accused arrived on the scene Frank E. Webb and Will Llewellyn each had purchased ice

from Throckmorton. Webb was chipping his ice on fish in his motor vehicle and Llewellyn was talking to him. The accused got out of his automobile, walked a few steps to the ice truck, ordered and paid for 100 lbs. of ice, which he requested to be divided into two pieces of 50 lbs. each. When Throckmorton attempted to cut the first 50 lbs. the ice did not break evenly. The accused told Throckmorton that the first piece of ice offered him did not weigh 50 lbs. Throckmorton agreed and said: "I will give you the other in the other piece." The accused replied if it was not 50 lbs. he was not going to pay for it. Llewellyn raised the ice with the tongs and said that it did weigh 50 lbs. A brief argument as to the weight of the ice ensued between him and the accused. However, the accused, being satisfied by the assurance of Throckmorton that he would make up the difference, carried the ice to his automobile, placed it in the trunk, and returned to the shed for the remainder of his ice. As he did so, Llewellyn asked him how much ice he wanted anyway; to which the accused replied that it was none of Llewellyn's business, he was not buying ice from him, he was buying it from the "boy"; to which Llewellyn replied: "You don't have to be so smart about it." The accused replied he would get as smart as he wanted to and repeated the remark to Webb who had said something about the ice.

The three witnesses for the Commonwealth, Frank E. Webb, Will Llewellyn and Richard Throckmorton, testified that the second piece of ice fell or was knocked from the truck to the ground. Frank E. Webb then said to the accused: "If you hadn't talked so smart and run off your mouth so much you wouldn't have dirt on your ice." The accused continued to "jaw" about the ice. Finally, Webb told Throckmorton: "If he keeps on fussing about the ice give him his money back or give him another piece" and let him go; whereupon, the accused "swung" the ice tongs at Webb. Throckmorton "hollered" to the accused to put the ice tongs down, they were not his. The wife of the accused got out of the automobile and came to the scene. She persuaded her husband to surrender the tongs and he either

gave them to her or to Throckmorton. The accused then went to the back of his automobile, got a metal pipe wrench, fourteen to eighteen inches long, and holding the same in both hands over his head ran towards Webb. As he brought the wrench down on Webb's head Llewellyn shoved him, thereby deflecting the blow. However, the wrench struck and cut a gash on the right side of Webb's neck and inflicted a minor bruise on his shoulder. Webb testified that when he saw the accused running at him with the wrench in his hands he yelled and "hit at him and did everything I could to protect myself. Will Llewellyn was standing there by me. He deflected the lick. If he hadn't I guess it would have killed me. . . . (A)bout that time Mr. Taylor, the Deputy Sheriff came down."

The testimony of the accused and his wife is substantially as follows:

As the accused reached down to pick up his second piece of ice Webb said: "If you want that ice you had better get it and get on away from here"; to which the accused replied: "I don't have to do that either because I'm not buying the ice from you." He saw Webb run his right hand in his pocket and "pulled out a knife and held his hand down by his side and started walking towards me and said to Throckmorton: 'Give him his money and let him get on away from here.' Just like that. I backed up. About that time Will said: 'Give me the ice tongs'. So I said: 'I'm going to give you nothing.' So he spoke up again and said: 'Give him the ice hooks, you are not going to carry those ice hooks from here. They are another man's hooks.'" About that time his wife came up and he gave the ice hooks to her and as he was backing up to the rear of his car Webb, Llewellyn and a third man followed him. Webb stepped out in front of the other two and called him "You smart son of a bitch". "I taken out this wrench and I hit him because he was coming up so close on me and I knew if he was up on me like that he was going to cut me up. . . . When I hit him he stepped back and about that time the deputy sheriff was there. . . . He (the deputy sheriff) ran up to me and told

me to give him the wrench. I told him that I would provided that he take the wrench from me and make the rest of them get back off me. That is why I didn't give him the wrench, because he was taking what I had and letting the rest of them go. They could do anything they wanted to to me. . . . But he was no protection, he was going to keep me from doing anything to them."

The three witnesses for the Commonwealth denied that Webb had a knife in his hand or that they or any of them followed the accused from the rear of the truck to the back of his automobile.

We find no error in the refusal of the trial court to set aside the verdict as it is well settled in this jurisdiction that where the evidence is sufficiently conflicting to create a reasonable difference of opinion, the verdict of the jury must be accepted by the trial court as well as by this Court.

The accused's second contention is that there is no evidence to support the following instruction granted on request of the Commonwealth:

"The Court instructs the jury that words alone, no matter how grievous or insulting, are never justification for an assault by force or violence."

It is true, as claimed by the accused, that none of the witnesses for the Commonwealth testified that profane or insulting language was used before the beginning of the affray, but both the accused and his wife testified that Webb called the accused "a smart son of a bitch" and the wife added ". . . and that is when Harold struck him." This phrase is usually regarded as grossly insulting, but the use of it does not justify or excuse an accused in making an assault by force or violence upon his adversary. This testimony fully justified the court in giving the instruction.

The accused's next contention is that the court erred in refusing to give on his request the following instruction:

"The Court further instructs the jury that the good character of the defendant, when considered in connection with the other evidence in the case, *may create a reasonable doubt* and the circumstances may be such that an established repu-

tation of good character, *if relevant to the issue, will alone create a reasonable doubt,* although the other evidence in the case might be convincing." (Italics supplied).

We find no error in the refusal of the court to grant this instruction. In the first place, the phrase, "if relevant to the issue", should not have been included in the instruction. The court and not the jury determines what evidence is and what evidence is not relevant. The court in permitting the evidence to be introduced necessarily held that it was relevant. The jury is the proper tribunal to determine the weight to be given the evidence that the court allows to be introduced.

In the second place, the expressions "may create a reasonable doubt" and "will alone create a reasonable doubt" are erroneous statements in an instruction on good character. It was said in *Owens* v. *Commonwealth*, 186 Va. 689, 708, 43 S. E. (2d) 895: "We have several times disapproved the phraseology of that portion of the instruction which would have told the jury that evidence of the previous good character of the accused 'may be sufficient to create a reasonable doubt as to his guilt or innocence.' *Briggs* v. *Commonwealth*, 82 Va. 554, 563; *Troutner* v. *Commonwealth*, 135 Va. 750, 755, 756, 115 S. E. 693; *Mitchell* v. *Commonwealth*, 141 Va. 541, 563, 564, 127 S. E. 368." ·

We have held that a proper instruction should read substantially as follows: "The character of a prisoner when proven, whether good or bad, is a fact to be considered by the jury, but its weight as affecting the guilt or innocence of a prisoner is a matter for the determination of the jury in connection with the other facts proven in the case." *Owens* v. *Commonwealth, supra*, pp. 708-9.

The accused proved by several witnesses, whose testimony was not contradicted by the Commonwealth, that his reputation for peace and good order, truth and veracity, was good. If he had offered a proper instruction on character, no doubt the court would have given it. Mr. Justice Spratley speaking for the Court in *James* v. *Commonwealth*, 192 Va. 713, 720, 66 S. E. (2d) 513, said:

". . . In the second place, it was not essential for the jury to be told that evidence of good character was a matter for their consideration, because if it had not been proper for their consideration its presentation would not have been allowed.

\*        \*        \*        \*        \*        \*        \*

"The record does not disclose that any other instructions on the subject of good character were tendered to the court and refused by it. The character of the defendant was not a fundamental issue and did not go to the gist of the case. It was not incumbent, therefore, on the court, unasked, to instruct the jury upon that subject."

█ The trial court over objections of the accused amended his instruction No. 2 by inserting the words in italics and by deleting the words in parentheses in the following instruction:

"The court instructs the jury that if the jury believe from the evidence in this case that the defendant was assaulted by Frank E. Webb in such manner as to make it appear to the defendant at the time that Frank E. Webb manifested, intended and endeavored to take his life or do him some bodily harm and that the danger was imminent and impending, then in that case the defendant *if he was not the aggressor* was not bound to retreat but have (had) the right to stand his ground, repel force with force, and do whatever necessary to save his own life or prevent his receiving great bodily injury, (and it is not necessary that it appear to the jury to have been necessary)."

The accused does not contend in this Court that the insertion of the words "if he was not the aggressor" was error. He concentrates his attack upon the deleted portion of the instruction. His argument is thus stated in his brief:

" . . . Petitioner believes that the portion deleted took from him one of the rights guaranteed to him by a long line of cases in this Court.

"Beginning with the case of *Wilkinson* v. *Allen*, 136 Va. 607 (1923), 118 S. E. 94, this Court has consistently held in

cases of assault and battery where the defendant claims self-defense that it is not necessary that he be actually in danger of his life or of great bodily harm, or that it so appear to the jury, but that the test is whether it reasonably appeared to the defendant at the time that his life was in danger or he was in danger of great bodily harm."

The accused in this argument includes a part of the test to be included in an instruction on apparent danger. That is, he says "the test is whether it reasonably appeared to the defendant at the time that his life was in danger or he was in danger of great bodily harm". Unfortunately, he did not include that test in the instruction. In addition, he quoted only part of the instruction which this Court approved in the *Wilkinson* case. The pertinent part of the instruction as approved by this Court is as follows:

If the jury believe " . . . the plaintiff did anything, which reasonably caused the defendant to believe that the plaintiff then and there intended to make an attack upon him, with a weapon, or with fists, the defendant had the right to do what seemed reasonably to be necessary to protect himself against such apparently threatened attacks, whether the same was real or not, provided he believed it was real, and for any injury done the plaintiff, by the defendant, in using reasonable means to defend himself, the defendant is not liable. . . .".

The trial court committed no reversible error in amending the instruction by the deletion. The instruction as requested made no well defined distinction between actual and apparent danger. In dealing with apparent danger the jury should be told that before an accused is justified in making an attack with a dangerous weapon upon his adversary he must honestly believe and must have reasonable cause to believe that he was in imminent danger of losing his life or suffering serious bodily injury. The deleted part, "and it is not necessary that it appear to the jury to have been necessary", while awkwardly expressed, is correct as far as it goes, but standing alone it is an incomplete statement of the correct principle of self-defense. It is also confusing and calculated

to give the jury the wrong impression. Under it the jury might have found the defendant not guilty even though it did not believe that there was an apparent necessity for the accused to strike Webb with a deadly weapon and that he was motivated by fear alone without reasonable cause for such fear. It was said in *Mercer* v. *Commonwealth*, 150 Va. 588, 597, 142 S. E. 369: " 'The bare fear that a man intends to commit murder, however well grounded, unaccompanied by any overt act indicative of such an intention, will not warrant killing the party by way of prevention.' *Litton's Case*, 101 Va. 850, 44 S. E. 923."

In *McReynolds* v. *Commonwealth*, 177 Va. 933, at 943, 15 S. E. (2d) 70, we said: "It is not enough for the accused to say that he was terrified. There is no way by which we can gauge his state of mind. Moreover, one whose nerves were unstrung might have been frightened by facts which would not have troubled an ordinary man at all. . . ."

In *Taylor* v. *Commonwealth*, 185 Va. 224, 38 S. E. (2d) 440, it was held by a divided court that it was error for the trial court to have inserted the words in italics in the following instruction offered by the accused (185 Va. 227):

"The court instructs the jury that in passing upon the danger, if any, to which the accused was exposed, you will consider the circumstances as they reasonably appeared to the accused and draw such conclusion from those circumstances as he could reasonably have drawn, situated as he was at the time; in other words, the court instructs you that the accused is entitled to be tried and judged by facts and circumstances as they reasonably appeared to him, *provided they would so appear to a reasonable man placed under similar circumstances*, and not by any intent that may or may not have existed in the mind of the deceased."

The reversal was based on the ground: "What reasonably appeared to the accused at the time of the shooting, as creating the necessity for his act, is the test and not what reasonably appeared to him, provided it would so appear to some other reasonable person under similar circumstances."

It is true that in *Fortune* v. *Commonwealth*, 133 Va. 669, 112 S. E. 861, this Court approved an instruction similar to the one offered by the accused, including substantially the same language as that deleted by the court in this case. However, that instruction was followed by instruction No. 9, which was as follows:

"The court instructs the jury that it is not essential to the right of self-defense that the danger should in fact exist.

"If to the defendant it reasonably appeared that the danger in fact existed he had the right to defend against it to the same extent and under the same rules which would obtain in case the danger had been real.

"The defendant may always act upon reasonable appearance of danger, and whether the danger is apparent or not is always to be determined from the standpoint from which the defendant viewed it at the time he acted."

The latter instruction clearly explained to the jury the meaning of the expression, "and it is not necessary that it appear to the jury to have been necessary", used by the court in the instruction preceding it.

The accused in the case now under consideration offered no instruction to modify or explain the language deleted. To have permitted the deleted part to remain in the instruction without explanation, as heretofore stated, would have been error. However, the trial court fairly and fully instructed the jury on the defendant's theory of the case. Indeed, instruction No. 3 given on the request of the accused is more favorable to him than a statement of the correct principles of self-defense would have been. The instruction is as follows:

"3. The Court instructs the jury that the use of any dangerous weapon or the semblance thereof, in an angry or threatening manner, with the intent to alarm or strike another under circumstances calculated to effect that object is an assault, and if you believe from the evidence that Frank E. Webb had in his hand a dangerous weapon or semblance thereof, that he angrily cursed the defendant and acted in a threatening manner, that the defendant was assaulted and

had a right to use all force reasonably necessary to repel said assault; he was not compelled to retreat from the said Frank E. Webb, if he the defendant was not the aggressor, but might, in his turn, become the assailant."

This instruction is erroneous because it told the jury in effect that if they believed that Webb with a knife in his hand "angrily" cursed the accused and acted in a threatening manner, the accused was justified in striking Webb with a deadly weapin. This is not the law. In order to justify an accused in striking another with a deadly weapon, as the accused admits he did in this case, a threatening attitude alone affords no justification. The adversary must have made some overt act indicative of imminent danger to the accused at the time. *Stoneman* v. *Commonwealth*, 25 Gratt. (66 Va.) 887; *Berkeley* v. *Commonwealth*, 88 Va. 1017, 14 S. E. 916.

This principle is stated in Davis' Criminal Law, pp. 353 and 354, as follows:

"An assault is an attempt or offer, with force and violence, to do some bodily hurt to another, whether from wantonness or malice, by means calculated to produce the end if carried into execution; as by striking at him with a stick or other weapon, or without a weapon, though he be not struck, or even by raising up the arm or a cane in a menacing manner, by throwing a bottle of glass with an intent to strike, by levelling a gun at another within a distance from which, supposing it to be loaded, the contents might injure, or any similar act accompanied with circumstances denoting an intention coupled *with a present ability*, of using actual violence against the person of another. But no words whatever, be they ever so provoking, can amount to an assault; * * * ". (Italics supplied).

We find no reversible error in the record and affirm the judgment.

*Affirmed.*